# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **UNITED STATES OF AMERICA** | : |
| v. | :  **CRIMINAL NO: 17-391-1** |
| **VAUGHN SPENCER** | : |

## GOVERNMENT'S SENTENCING MEMORANDUM

The United States of America, by its attorneys, Louis D. Lappen, Deputy United States Attorney for the Eastern District of Pennsylvania, and Michelle L. Morgan and Anthony J. Wzorek, Assistant United States Attorneys for the District, hereby submits its sentencing memorandum in the above-captioned case, and recommends a sentence of incarceration of 121-151 months.

## I. PROCEDURAL BACKGROUND

On August 31, 2018, after a two-week trial, a federal jury convicted defendant Vaughn Spencer of one count of conspiracy to commit honest services wire fraud and bribery, in violation of 18 U.S.C. § 371; eight counts of bribery/soliciting, in violation of 18 U.S.C. § 666(a)(1)(b); one count of bribery/offering, in violation of 18 U.S.C. § 666(a)(2); and one count of honest services wire fraud, in violation of 18 U.S.C. §§ 1343, 1346. Sentencing is scheduled for April 24, 2019.

## II. EVIDENCE IN SUPPORT OF THE CHARGE

The government incorporates the factual summary that it provided to the Court in its response to the defendant's Rule 29 motion and its arguments made at the close of the government's case in August 2018, at the Rule 29 hearing on April 4, 2019, and in its letter

briefing before and after that hearing.

As the Court is aware, this case involved a conspiracy to commit bribery and honest services wire fraud with the goal of maximizing then-Mayor Vaughn Spencer's campaign contributions for the democratic primary in May 2015. Spencer's conduct charged in the indictment involved three distinct schemes.

   **A. T&M Bribery Scheme**
     **Count 1 (Conspiracy)**
     **Counts 4, 8 (Bribery - soliciting)**

Between January 2012 and July 2015, the defendant solicited multiple bribes in the form of contributions to his re-election campaign from the engineering firm T&M Associates (T&M) in exchange for his agreement to engage in official acts, including the awarding of the 6th & Canal Long Term Improvements contract, and the 19th Ward Pump Station contract. These explicit *quid pro quo* agreements were established through the testimony of trial witnesses, including Mark Neisser of T&M, who engaged in *quid pro quo* conversations with the defendant, as well as with Sam Ruchlewicz, who worked on the mayor's campaign, solicited contributions from Neisser for the mayor, and recorded conversations with both Neisser and the mayor, Ralph Johnson, the Director of Public Works, and various contract evaluation committee members, who were involved in the contract awarding process.

Exhibits admitted at trial, including numerous checks, recorded conversations, evaluation committee score sheets, and contract recommendation memoranda, established the following overt acts. On January 5, 2012, T&M contributed $1,500 to defendant's inauguration and transition fund. In March 2012, the defendant directed that T&M be awarded the Secondary Digester engineering contract in Reading despite T&M not being the preferred bidder selected by

the evaluation committee. The approximate value of this contract was $205,000. On July 23, 2013, Mark Neisser caused T&M to give a $1,000 campaign contribution to defendant. On April 23, 2014, defendant directed that T&M be awarded the 6th & Canal Short Term Improvements engineering contract in Reading, despite T&M not being the preferred bidder selected by the evaluation committee. The approximate value of this contract was $190,000. According to the committee members who testified at trial, the defendant clearly inserted himself into the process and overruled the decision of the committee in regard to both of these contracts so that T&M would be awarded the contracts. This conduct set the stage between the parties for the ensuing *quid pro quo* arrangement.

On April 25, 2014, two days after he awarded the 6th & Canal Short Term Improvements contract to T&M, the defendant stated to Ruchlewicz, "I cleared [the contract] for [T&M]. So we need to get something from them," referring to a campaign contribution. Echoing that same sentiment, on October 24, 2014, defendant stated to Ruchlewicz regarding his expectation of a $1,500 campaign contribution from T&M, "I went out of my way for [T&M] . . . [T]hat project, they weren't even, they were, they were already ruled out. . . . And I got them back in there and got them approved." On October 30, 2014, at the direction of defendant, Ruchlewicz contacted Mark Neisser by telephone and stated that defendant was expecting a $1,500 campaign contribution. The next day, on October 31, 2014, Mark Neisser asked Ruchlewicz where to send money "to make sure that we don't . . . have a direct effect on the Reading pay to play" law, was told to send the money to a specific political action committee, and was assured that it would benefit defendant. In this same conversation, Mark Neisser acknowledged that defendant "went out of his way" for T&M by awarding it two prior municipal engineering contracts.

3

On November 24, 2014, Mark Neisser met defendant for lunch at a restaurant. At that meeting, Mark Neisser confirmed that T&M would be giving defendant a $1,500 campaign contribution. The defendant stated that he "had to assert [him]self into" the prior contract bidding process on behalf of T&M, and Mark Neisser responded, "I remember," and, "We appreciate your help, Mayor. We really do." The defendant then stated that he would "look into" the 6th & Canal Long Term Improvements contract for which T&M was bidding. Mark Neisser also offered the defendant four tickets and a parking pass to a Philadelphia Phillies game. The defendant then reiterated to Mark Neisser that he would use his elected office to help T&M receive the 6th & Canal Long Term Improvements contract, valued at approximately $227,000. The same day, Mark Neisser caused a $1,500 contribution to be made by T&M to defendant's re-election campaign. Soon thereafter, on January 2, 2015, T&M bid on the 6th & Canal Long Term Improvements contract in Reading. However, their bid was approximately three times higher than the other bidders, so the defendant could not give them the contract without raising suspicion, which he acknowledged in several recorded conversations. On May 20, 2015, Mark Neisser advised Ruchlewicz that he was sending a check for $500 and discussed the potential for T&M to receive the 19th Ward Pump Station contract in Reading, valued in excess of $472,000.

B. **McTish Bribery Scheme**
  **Count 1 (Conspiracy)**
  **Counts 2, 3, 5, 6, 7, 9 (Bribery - soliciting))**

Between January 2012 and July 2015, the defendant solicited multiple bribes in the form of contributions to his re-election campaign from the engineering firm McTish Kunkel & Associates (MKA) in exchange for his agreement to engage in official acts, including the awarding of the River Road Extension contract, the 2nd & Penn Complete Streets contract, and

4

the 19th Ward Pump Station contract. These explicit *quid pro quo* agreements were established through the testimony of trial witnesses, including Matthew McTish, who engaged in *quid pro quo* conversations with the defendant; Sam Ruchlewicz, who worked on the mayor's campaign, solicited contributions from McTish for the mayor, and recorded conversations with both McTish and the mayor; Eron Lloyd, the mayor's Special Assistant for Sustainability and campaign treasurer; and Ralph Johnson, the Director of Public Works, to whom the mayor indicated that McTish was the preferred vendor with regard to the 2nd & Penn Complete Streets and 19th Ward Pump Station contracts.

Exhibits admitted at trial, including numerous checks and recorded conversations, established the following overt acts. On April 21, 2014, Matthew McTish made a $1,500 campaign contribution to defendant, and at the time, they discussed potential engineering contracts in Reading, including the multi-million-dollar River Road Extension project. On October 9, 2014, Matthew McTish made a $1,250 campaign contribution to defendant, at which time MKA had just bid on the River Road Extension contract. This contract ultimately was not awarded to MKA.

On December 10, 2014, defendant arranged a meeting for Matthew McTish with the new Director of Public Works, Ralph Johnson, to discuss MKA doing future work for the city. During that meeting, defendant called on speaker phone to confirm that the two were meeting. Two weeks later, on December 22, 2014, Matthew McTish caused his brother, David McTish, to make a $1,125 contribution to defendant's re-election campaign. The next day, on or about December 23, 2014, defendant spoke to Ralph Johnson about awarding the 2nd & Penn Street project to MKA. On March 2, 2015, defendant caused the City of Reading to award the 2nd &

Penn contract to MKA, after granting Matthew McTish special access to Ralph Johnson to discuss and modify his firm's proposal.  This contract was valued at approximately $7,000.  On April 11, 2015, three days after being advised that he could move forward with the 2nd & Penn project, Matthew McTish attended a fundraiser for defendant and gave defendant a $1,500 campaign contribution.

On April 30, 2015, Matthew McTish told the defendant that he may be able to secure campaign contributions from AECOM, with which MKA was partnering on a proposal for the 19th Ward Pump Station contract, and they discussed AECOM and MKA getting that contract, valued at $472,000 (with the subcontract value to MKA of approximately $92,000).  The defendant and Ruchlewicz also agreed to show a competitor's proposal to Matthew McTish so that MKA could underbid the competitor.  On May 15, 2015, shortly before the primary election, in exchange for the "inside track" on the awarding of the 19th Ward Pump Station contract, Matthew McTish caused two AECOM representatives to contribute $500 apiece, for a total of $1,000, to defendant's re-election campaign.  Shortly after the election, defendant instructed his Chief of Staff, Eron Lloyd, to ensure that Matthew McTish was "taken care of" with respect to the 19th Ward Pump Station contract. On June 4, 2015, at defendant's direction, Eron Lloyd met with Matthew McTish.  At that meeting, while MKA's bid on the 19th Ward Pump Station was pending, McTish provided a $500 check to the Reading PAC.  As Ralph Johnson testified at trial, the defendant clearly indicated to Johnson that the defendant wanted MKA (and AECOM) to receive this contract, which they ultimately did.

C. **Ordinance Repeal Scheme**
   **Count 1 (Conspiracy)**
   **Count 12 (Bribery - offering)**
   **Count 14 (Honest services wire fraud))**

Between March 2015 and May 2015, the defendant offered a bribe to City Council President Francisco Acosta in the form of an $1800 campaign contribution to Acosta's wife, Reading School Board President Rebecca Acosta, who was running for district magistrate judge. In exchange for this payment, Francisco agreed, with the assistance of Rebecca, to ensure that City of Reading Code of Ethics Section 1012 would be amended or repealed by City Council. Section 1012 limited any individual's contribution to a candidate running for city office to $2600 per year. The defendant sought to amend or repeal Section 1012 because he had already received tens of thousands of dollars from contributors Albert Boscov and Jack Gulati in excess of this limit.[1] This explicit *quid pro quo* agreement was established through the testimony of trial witnesses, including Eron Lloyd, the defendant's Special Assistant and campaign treasurer, who engaged in *quid pro quo* conversations with the defendant; and Sam Ruchlewicz, who worked on the mayor's campaign and recorded conversations with the mayor, Francisco Acosta, and Rebecca Acosta.

Exhibits admitted at trial, including the $1800 check and recorded conversations, established the following overt acts. On March 26, 2015, Sam Ruchlewicz asked Francisco Acosta to propose a bill in City Council to amend or repeal Section 1012. In exchange, Ruchlewicz told Francisco Acosta that he would give co-defendant Rebecca Acosta a campaign contribution of $1,000 to $2,000 from the Reading PAC, as well as the promise of contributions

---

1 Boscov contributed $41,000 in 2011, $5500 in 2014, and $50,000 in 2015.  Gulati contributed $5000 in 2014 and $5000 in 2015.

7

from another specific set of contributors of $10,000.  A few days later, on March 30, 2015, Ruchlewicz additionally told Francisco Acosta that he would ensure a campaign contribution of $5,000 to Rebecca Acosta from Albert Boscov, a major local donor.  On April 2, 2015, Ruchlewicz told Rebecca Acosta to ensure that her husband, Francisco Acosta, amended or repealed Section 1012.   Rebecca Acosta complained that she hadn't received the promised $5,000 from Albert Boscov.  Ruchlewicz then reminded Rebecca Acosta to talk to Francisco Acosta about repealing Section 1012, and she responded, "I will talk to him." Ruchlewicz assured her that once the matter was resolved, she would receive the $5,000 from Albert Boscov.

On April 7, 2015, Ruchlewicz again asked Francisco Acosta to repeal or amend Section 1012, and said that Rebecca Acosta would receive the $5,000 from Albert Boscov.  Francisco Acosta said that Rebecca Acosta needed $1,800 for billboards for her judicial campaign.  Ruchlewicz then spoke to defendant Spencer, who said he wanted an advanced copy of the proposed bill to amend or repeal Section 1012, agreed to give $1,800 from the Reading PAC to Rebecca Acosta as a "loan," and said, "I just wanna make sure [Francisco Acosta] follows through on it."  On April 10, 2015, Ruchlewicz handed Francisco Acosta an $1,800 check made out to Friends for Rebecca Acosta from the Reading PAC, and they discussed whether the repeal was likely to pass.  Francisco Acosta agreed to introduce the bill to amend or repeal Section 1012 the following Monday. That same day, as requested by defendant Spencer, Francisco Acosta sent an electronic mail message to Ruchlewicz containing a draft bill to amend Section 1012 by increasing the individual contribution limit from $2,600 to $4,000, and an alternative draft bill to repeal Section 1012 entirely.

On April 13, 2015, Francisco Acosta introduced the draft bill to repeal Section 1012 in City Council. On April 16, 2015, Rebecca Acosta told Ruchlewicz that she had gone with Francisco Acosta to speak to two council members who were opposed to the repeal of Section 1012 in an effort to persuade them. Ruchlewicz told Rebecca Acosta that Albert Boscov couldn't write her a campaign contribution check until Section 1012 was repealed, and Rebecca Acosta said, "[Boscov] can write me checks. I'm not running for the city. I'm not employed by the city. I'm not an elected official in the city." On April 17, 2015, Francisco Acosta stated to Ruchlewicz that he hadn't deposited the $1,800 check for Rebecca Acosta from the Reading PAC and would not until after the primary election, so that the money would not appear to be connected to Francisco Acosta introducing the bill to repeal Section 1012. The bill did not pass because, unbeknownst to defendant Spencer, the FBI intervened. Spencer later stated to Ruchlewicz, "We're paying him money and the mother fucker didn't do a godda- I mean, he did nothing, Sam, nothing."

## III.  SENTENCING GUIDELINES

The United States Probation Department has calculated the defendant's sentencing guidelines range as 38-I, resulting in a guideline sentencing range of 235 to 293 months' incarceration.[2] It appears that the Probation Office reached this level by calculating the loss under Section 2C1.1, Application Notes 2 and 3, to be "(1) the total value of the contracts ($721,000) and (2) the total campaign contributions to the defendant ($121,675)," for a total of approximately $841,000. Presentence Report (PSR) ¶¶ 67-68. This lump sum presumably

---

2 As of this filing, the government has not yet received the final Presentence Report in this matter. Therefore, these arguments are based on the draft report.

includes: contracts that were not alleged to be part of an explicit *quid pro quo* (such as the Secondary Digester contract and the 6th & Canal Short Term Improvements contract), *see* PSR ¶ 56, which the government submits is improper; contracts that T&M sought but did not obtain (6th & Canal Long Term Improvements), *see* PSR ¶ 56; and a contract from which MKA was ultimately removed (19th Ward Pump Station), *see* PSR ¶ 55.  Also, this sum does not reflect the net (as opposed to gross) value of the contracts, as required by the Sentencing Guidelines Application Note.

The government objects to this calculation of loss and submits that loss should be calculated as follows.  Guidelines Section 2C1.1(b)(2) indicates that the table in 2B1.1 should be applied according to "the value of the payment, the benefit received or to be received in return for the payment, the value of anything obtained or to be obtained by a public official or others acting with a public official, or the loss to the government from the offense, whichever is greatest." Application Note 3 clarifies that the value of "the benefit received or to be received" means the net value of such benefit (*i.e.*, contract amount minus costs).

In regard to the McTish scheme, the value of the benefit received would be the net value of the $7000 2nd & Penn contract, which was reportedly de minimus.  Further, while MKA was a subcontractor on the 19th Ward Pump Station contract awarded to AECOM, and MKA hoped to be paid $92,000 gross for that subcontractor work, MKA was ultimately removed from the project and replaced.  That net value to McTish, then, is difficult to determine.  Accordingly, the appropriate calculation of the benefit received for this scheme is the total of the bribes charged in the indictment that were offered by McTish, which is $6875.

In terms of the T&M/Neisser scheme, T&M was not awarded the 6th & Canal Long Term

10

Improvements contract (total value $227,000), and, as stated above, the Secondary Digester and 6th & Canal Short Term Improvements contracts were not explicit *quid pro quo* agreements. Therefore, the government submits that the appropriate calculation of the benefit received is the total of the bribes charged in the indictment that were offered by T&M/Neisser, which is $2000.

In light of all of the above, the government submits that value of the benefits received is properly calculated as follows:

| | |
|---|---|
| $6875 | Total charged bribes offered by McTish |
| $2000 | Total charged bribes offered by Neisser |
| $88,700 | Total Spencer hoped to retain from Boscov ($96,500 minus $7800 permissible contribution ($2,600 for each of 3 years)) by bribing the Acostas |
| $4,800 | Total Spencer hoped to retain from Gulati ($10,000 minus $5200 permissible contribution ($2,600 for each of 2 years) by bribing the Acostas |
| **$102,375** | **GRAND TOTAL** |

This results in the addition of 8 points under 2B1.1(b)(1)(E) (rather than 14), which ultimately leads to a total offense level of 32, and a Guidelines range of 121 to 151 months.

**IV.   ANALYSIS**

The Supreme Court has declared: "As a matter of administration and to secure nationwide consistency, the Guidelines should be the starting point and the initial benchmark." Gall v. United States, 128 S. Ct. 586, 596 (2007). Thus, the Sentencing Guidelines remain an indispensable resource for assuring appropriate and uniform punishment for federal criminal offenses.

This Court must also take into account all of the sentencing considerations set forth in 18 U.S.C. § 3553(a). Those factors include: (1) the nature and circumstances of the offense and the history and characteristics of the defendant; (2) the need for the sentence imposed to reflect

the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense; (3) the need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; (4) the need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner; (5) the guidelines and policy statements issued by the Sentencing Commission; (6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need to provide restitution to any victims of the offense. 18 U.S.C. § 3553(a).

### Consideration of the 3553(a) Factors.

#### (1) The nature and circumstances of the offense.

This case is about ambition run amok. Defendant Spencer wanted to be re-elected as Mayor of Reading, and set aside his ethics to do so. In order to obtain and retain as many campaign contributions as possible, he put city engineering contracts up for sale, maligning the otherwise fair bidding process. Taking corruption to a new low, he also bribed the President of City Council and the President of the School Board to try to repeal a local ordinance that put limits on how many campaign contributions Spencer could accept - - designed to avoid the very illicit conduct in which he was engaging.

In addition to being willing to violate his own ethics in order to raise this money, Spencer also had the power to bend others under him in Reading government, like Eron Lloyd, Francisco Acosta, Rebecca Acosta, Ralph Johnson, and evaluation committee members, to do his bidding and violate their own duty to the citizens of Reading. As the Mayor, he also had the power to influence the contracting process in Reading and to use it to obtain campaign contributions from

people like Matthew McTish and Mark Neisser. Spencer used others like Michael Fleck and Sam Ruchlewicz as buffers to do the type of dirty work that he tried to avoid doing directly. Ultimately, Spencer could have ended this polluted process at any point. But he didn't. Instead, the Mayor put his own interests first over the citizens of Reading and over the other bidding companies who expected that when they bid on a Reading contract, the competition would be fair and honest. Even after the FBI searched Reading City Hall and interviewed Spencer, he continued to blatantly lie about his corrupt dealings.

**(2)** **The history and characteristics of the defendant.**

The defendant is 71 years old and is a lifelong resident of Reading, Pennsylvania, where he was raised by a father who was a police officer, and a mother who was a homemaker. PSR ¶¶ 90, 96. The defendant married in 1969 and divorced in 1976, and in his next relationship, had a daughter, who tragically was killed by a car while crossing the street at the age of six. PSR ¶¶ 93-94.

The defendant graduated from Cheyney University in 1969, and was a teacher of social studies in the Reading School District for 37 years from 1971 to 2008. PSR ¶¶ 111, 119. He then served on Reading City Council, first as councilman in 2002, and then as president from 2003 to 2012. PSR ¶ 118. He was elected as the Mayor of Reading and took office in January 2012. PSR ¶ 116. In sum, the defendant laudably devoted his entire career to serving his community, yet unfortunately appears to have gotten drunk with power in his role as mayor.

**(3)** **The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense.**

**(4)** **The need to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant.**

The public has a right to expect that its public officials, and all who interact with them, will conduct themselves in a fair and honest way when engaged in municipal business. The public also has a right to expect that all business conducted by the city is for the benefit of the community as a whole and not to benefit the public official. It is cases such as this that alienate people from their government and their elected officials and cause a distrust of government. The long-term effects of that alienation cannot be measured but potentially are very serious. After learning the facts of this case, it is easy to see why people may feel that they cannot get a fair shake from their own government, and opt out of the system.   When the public's expectations are dashed in a scheme such as the present one, the community as a whole is injured and the concepts of honesty in government and respect for the law are ridiculed. The offenses here are serious ones and the punishment must also be serious.

This also is a case that calls out for clear general deterrence. Every public official giving out governmental contracts and every business person seeking work from local, state, and federal governments needs to see that the consequence for engaging in a bribery scheme is a substantial period of imprisonment. Because of the high profile nature of this prosecution, this Court's sentence will be heard across the Commonwealth of Pennsylvania and beyond. The right message must be conveyed, especially to all public officials.

    **(5)**     **The need to provide the defendant with educational or vocational training, medical care, or other correctional treatment in the most effective manner.**

The defendant reported that he had recent knee replacement and spinal stenosis surgery, and is being treated for hypertension and elevated cholesterol.  PSR ¶¶ 101-102.  He disavowed any recent mental health issues, or any substance abuse since 1990.  PSR ¶¶ 104-110. The defendant has been employed his entire adult life and is currently retired and receiving a pension

14

from the Reading School District. PSR ¶ 115.

**(6)** **<u>The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct.</u>**

As the Court is aware, this investigation implicated the administrations of both the City of Reading and the City of Allentown, with the respective mayors of those cities engaging in substantially similar pay-to-play schemes to maximize campaign contributions utilizing the same campaign consultants. A number of individuals have been sentenced in these related cases.

<u>Edwin Pawlowski</u>, the former Mayor of Allentown who was found guilty on multiple counts of bribery, mail and wire fraud, and false statements by a jury on March 1, 2018, was sentenced to 15 years' incarceration.

<u>Scott Allinson, Esq.</u>, his co-defendant, was convicted by the same jury for offering a bribe to Mayor Pawlowski and sentenced to 27 months' incarceration.

<u>Francisco Acosta</u>, former Reading City Council President who pled guilty to conspiracy to commit bribery, was sentenced to 24 months' incarceration.

<u>Rebecca Acosta</u>, former President of the Reading School Board who pled guilty to conspiracy to solicit a bribe from Mayor Spencer, and whose suggested sentencing guidelines range was 18-24 months' imprisonment, entered into a "C" plea for 18 months' imprisonment.

<u>James Hickey, Esq.</u>, who pled guilty to one count of honest services mail fraud and one count of honest service wire fraud for offering bribes to public officials in both Reading and Allentown, and whose suggested sentencing guidelines range was 18-24 months' imprisonment, entered into a "C" plea for 18 months' imprisonment.

<u>Garrett Strathearn</u>, former Finance Director for the City of Allentown who pled guilty to conspiracy to commit bribery and testified at trial against Pawlowski, received a sentence of 6

15

months' house arrest and 5 years' probation, pursuant to a cooperation plea agreement.

Eron Lloyd, former Special Assistant for Sustainability for the City of Reading, and campaign treasurer, who pled guilty to conspiracy to commit bribery and testified at trial against Spencer, received a sentence of 5 years' probation, the first 6 months of which included home confinement, and a $7,500 fine, pursuant to a cooperation plea agreement.

Dale Wiles, Esq., former Assistant City Solicitor for the City of Allentown who pled guilty to conspiracy to commit mail and wire fraud and testified at trial as a defense witness for Pawlowski, received a sentence of one day of incarceration and 3 months' home confinement, pursuant to a cooperation plea agreement.

Francis Dougherty, former Managing Director of the City Allentown who pled guilty to conspiracy to commit mail and wire fraud and testified at trial against Pawlowski, received a sentence of 3 years' probation, pursuant to a cooperation plea agreement.

Mary Ellen Koval, former City Controller for the City of Allentown, who pled guilty to conspiracy to commit honest services fraud, received a sentence of 2 years' probation and a $5000 fine, pursuant to a cooperation plea agreement.

Patrick Regan, Esq., who pled guilty to conspiracy to commit mail and wire fraud and had a suggested sentencing guidelines range of 0-6 months' imprisonment, received a sentence of 2 years' probation.

### (7) **The need to provide restitution to any victims of the offense.**

Restitution is not at issue in this case.

### V. **GOVERNMENT'S RECOMMENDATION**

After considering the sentence guidelines, policy statements, and the factors of 18 U.S.C. § 3553(a), the government recommends a sentence of imprisonment of 121 to 151 months.

The government also recommends that the Court remand defendant Spencer to the custody of the U.S. Marshals immediately following the sentencing. Title 18, United States Code, Section 3143(a) provides as follows:

> Release or Detention Pending Sentence. (1) Except as provided in paragraph (2), the judicial officer shall order that a person who has been found guilty of an offense and who is awaiting imposition or execution of sentence, other than a person for whom the applicable guideline promulgated pursuant to 28 U.S.C. 994 does not recommend a term of imprisonment, be detained, unless the judicial officer finds by clear and convincing evidence that the person is not likely to flee or pose a danger to the safety of any other person or the community if released under section 3142(b) or (c). If the judicial officer makes such a finding, such judicial officer shall order the release of the person in accordance with section 3142(b) or (c).

18 U.S.C. § 3143(a). Thus, to be released pending execution of sentence, the defendant must prove by clear and convincing evidence that he is not likely to flee or pose a danger to the safety of any other person or the community if released. The defendant cannot sustain his heavy burden of proof. The magnitude of the sentence likely to be imposed and the defendant's possession of the means to flee combine to make the defendant a flight risk. Consequently, the government recommends immediate remand.

Respectfully submitted,

LOUIS D. LAPPEN
Deputy United States Attorney


s/ *Michelle L. Morgan*
MICHELLE L. MORGAN
ANTHONY J. WZOREK
Assistant United States Attorneys

17

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Government's Sentencing Memorandum has been filed on ECF and thus served upon:

Geoffrey R. Johnson, Esq.
1110 Wellington Road
Jenkintown, PA 19046

                                                s/ *Michelle L. Morgan*
                                                MICHELLE L. MORGAN
                                                Assistant United States Attorney

Date:   April 16, 2019